STEPHENS *v.* SMITH.

5-2341                                           345 S. W. 2d 10

Opinion delivered April 10, 1961.

*O. E. Gates,* for appellant.

*Boyce R. Love,* for appellee.

CARLETON HARRIS, Chief Justice. On September 20, 1954, appellees, Terrell (Bunk) Smith, and A. B. Goodgame, entered into an agreement with appellant, Sam Stephens, of Monticello, d/b/a Stephens Pontiac & Equipment Company, to purchase a mechanical cotton picker, for the price of $8,517. As purchasers, they executed a conditional sales contract agreeing to pay for the picker as follows:

| | |
|---|---|
| Cash with Order | $ 100.00 |
| Cash on Delivery | 3,081.00 |
| Installment Note, 12-1-54 | 1,231.00 |
| Installment Note, 10-15-55 | 1,652.00 |
| Installment Note, 12-1-55 | 2,463.00 |

The $100 in cash was paid, and a down payment note was given for the $3,081.[1] This note bore the notation at the bottom of the left hand corner, "to be paid out of picking", followed by another notation, just beneath, "subject to renewal". Admittedly, $807 was paid on the down payment note through monies received from picking. This constituted the total payment made, and suit was subsequently instituted by appellant to enforce payment on the down payment note. On hearing, the court, sitting as a jury, entered judgment for appellees. From such judgment, comes this appeal.

We are only concerned with whether there was substantial evidence to support the judgment of the trial court. All parties agree that appellees were to pay $25 out of each bale of cotton picked by the machine on the down payment note. Appellees contend that their lia-

---

[1] Actually, the note was for $4,312, including the note due December 1, 1954, for $1,231, which was a part of the installment payment.

bility was limited to the $25 per bale for each bale picked, and that the picker was retaken by appellant, thereby preventing appellees from picking any additional cotton with the machine. Appellant contends the parties agreed that if the $25 payments from each bale were not sufficient to discharge the indebtedness due on this note, the note would be renewed, and he asserts that he did not repossess the picker. As to the renewal notation, appellees assert that this notation was placed there for their protection. As stated by Goodgame:

"The first words, 'To be paid out of picking' to me meant, and to Mr. Stephens at the time that I entered into this agreement to buy the picker, was that for every bale of cotton we picked, $25.00, I assumed we were going to be picking for $2.00 a hundred, and $25.00 was to be given to Mr. Stephens as against this note up until the time it was paid off, and subject to renewal written underneath was placed there when, as I at the time thought, about the fact that we might pick $2,000.00 worth of cotton and not $4,000.00 worth, inasmuch as I was working hauling cotton and so forth, I didn't want to pay say half of the note and then lose all of my work, my equity in the picker, because it was not full satisfaction, so that is the reason it was subject to renewal. That meant if we didn't pick enough cotton that year as long as we paid $25.00 against the note for all we did pick, then we were to have more time and nothing was to have been billed according to our agreement except what the picker earned—no cash was involved because at the time I had no cash to put in."

Stephens' testimony is not clear on the point of whether he expected the notes to be paid by appellees with additional monies other than that gained from picking.[2]

_____

[2] From the testimony: "Now, Mr. Stephens, that was to be paid out of picking, this notation on here, I notice, it is in typewritten letters, as the rest of the note is, which evidently was put on there by someone in your office, is that true? A. Yes. Q. That meant that $25.00 out of every bale picked with this picker was to be applied against this note, is that correct? I believe that is what you testified? A. Yes. Q. What happened if no cotton was picked? Was there any agreement on that originally? Suppose the thing broke down and could not pick any cotton? A. Well, it states on the note we would renew the note. Q. I

The arrangement between appellant and appellees is a little out of the ordinary, but we agree with the trial court that the parties had the right to make the agreement relative to the manner of the payment of the note. See *Toulmin & Toulmin* v. *Underwood,* 172 Ark. 813, 290 S. W. 377. Likewise, in 7 American Jurisprudence, § 49, p. 815, we find:

"The cardinal rule of construction is to ascertain the intention of the parties. * * * The contract primarily must be collected from the four corners of the document, and no part of what appears there is to be excluded. In expounding any agreement, however, the court must consider the subject matter; the object of making it; the sense in which the parties mutually understood it at the time it was made; and the place where it was entered into."

Further, § 53, p. 816:

"It is a general rule, well supported by authority, that marginal notations or memoranda, placed on a bill or note at the time of the execution thereof with the intention of making them a part of the contract, constitute a part of the contract, and must be construed with the body of the instrument to arrive at the true agreement existing between the parties."

We conclude there was substantial evidence to support the finding that the picker was to be paid for only from the proceeds of bales picked, at the rate of $25.00 per bale.

---

want to ask you about that. As far as any agreement you all had, wasn't that the complete agreement, the $25.00 out of every bale was to be applied against this thing and that was the way it was to be paid? A. Not necessarily. The note was due December 1st—all picked before that was supposed to be applied on the note. I couldn't say that is all we were expecting to get on it. Q. But you say this thing is executed in September, I guess they commenced cotton picking about that time did they not? A. Yes. Q. The cotton picking season would be over within a couple of months—you knew they were not picking enough cotton to pay this by December 1st, did you not? Was it possible for them to pick enough cotton to pay for it by December 1st? A. Well, I couldn't answer that exactly. I think it was, but I wouldn't say about that. Q. There is a slight possibility of it? A. How they were going to pay the rest of it, I don't know."

Relative to the repossession of the picker, the evidence was conflicting. Appellant first testified that he did not pick up the machine, but that appellees drove it to his place in Monticello; however, Stephens subsequently testified that he took possession of the machine in January, 1955; that it was taken to his shop at Dumas for replacement of parts and reconditioning for further picking by appellees, but that they did not pick up the machine. "I drove it off, drove it in for repairs—I didn't drive it in for the purpose of repossessing it as stated before in my testimony." Goodgame denied that he took the machine in, and stated that it was picked up by "some man, I assume out of Mr. Stephens' office"; that he was in the Veterans Hospital in Little Rock at the time, and on returning home, found that the picker was no longer there. Smith knew nothing about the repossession except what he had been told by Goodgame. Mrs. Goodgame testified that the cotton picker was repossessed by one of Mr. Stephens' employees, who told her that he was appellant's brother; that the latter came to her place of employment and obtained the key to the machine. She stated that she gave him the key and told him where the picker was located, and when she returned home from work, the picker was gone. The court found that:

"The testimony on the part of the plaintiff showed that he took the cottonpicker back about the 7th day of January, 1955. This he had a right to do since the $1,231.00 installment due 12-1-54 (included in the $4,312.00 note) was not paid.

\*　　　\*　　　\*

"The plaintiff took the picker and by his actions, the defendant was prevented from picking cotton the following season and paying the note in the manner specified, and for this reason the plaintiff does not have a cause of action against the defendant for the past due amount on the down payment note."

We are unable to say that this finding was not supported by substantial evidence.

Affirmed.